UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SANDY BOUTROS, | ) | |
| | ) | No. 16 CV 5133 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| PARK PLAZA NORTHWEST HOME | ) | |
| FOR THE AGED and YEHUDA | ) | |
| LEBOVITS, | ) | |
| | ) | November 30, 2016 |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER

Before the court is Defendant Yehuda Lebovits's motion to dismiss the intentional infliction of emotion distress ("IIED") claim against him in the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is granted:

**Procedural History**

Sandy Boutros brings this seven-count action against Northwest Home for the Aged d/b/a Park Plaza ("Park Plaza") and Lebovits. In the original complaint, filed on May 11, 2016, Boutros alleged violations of Title VII of the Civil Rights Act of 1964, violations of the Illinois minimum wage laws, tortious battery, and IIED. (R. 1.) On June 14, 2016, Lebovits moved to dismiss several counts against him. (R. 11.) On June 21, 2016, the parties consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). (R. 19.)

At the motion hearing held on September 22, 2016, the court dismissed with prejudice all Title VII counts brought against Lebovits individually, but allowed Boutros to file an amended complaint to supplement the IIED claim. (R. 32.) During this motion hearing, the court agreed with the legal standard Boutros asserted in opposition to the motion to dismiss but explained that her allegations fell short of the "extreme and outrageous" standard and that other causes of action—rather than IIED—were better suited to address the issues raised by Boutros. The court identified all of the allegations in the complaint that may potentially support the IIED claim and explained why they were deficient.

On October 6, 2016, Boutros filed a seven-count amended complaint in which Lebovits is individually sued in Count VI (battery) and Count VII (IIED). (R. 33.) Despite the deficiencies the court detailed during the motion hearing, the allegations in the amended complaint are nearly identical to those asserted in the original complaint. Lebovits again moves to dismiss the IIED claim. (R. 36.)

**Boutros's Allegations**

The following facts are set forth in the amended complaint, which the court accepts as true for purposes of a motion to dismiss. *See Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). Boutros is an Iraqi, Christian woman. (R. 33, Am. Compl. ¶ 7.) In September 2014, Boutros began working as a waitress at Park Plaza, a senior independent living retirement community in Chicago. (Id. ¶¶ 7-8, 10.) By May 2015, she was promoted to the position of head waitress. (Id. ¶ 11.) But three months later, in August 2015, Park Plaza

2

terminated her employment. (Id. ¶ 7.) Lebovits, as Park Plaza's Executive Director, managed Boutros during her employment. (Id. ¶ 9.)

During her employment at Park Plaza, Boutros assisted her direct supervisor, Executive Chef Sam Landman, with recruiting wait staff and with conducting screening interviews. (Id. ¶ 20.) Lebovits made all final hiring decisions. (Id.) Boutros alleges that Lebovits expressed preference for certain types of employees. He instructed Boutros to hire "young, pretty girls," because he wanted "sexy" workers at Park Plaza. (Id. ¶ 19.) He also gave instructions to Boutros not to hire "African Americans, practicing Muslims, or female dishwashers." (Id.) On at least a couple occasions, Lebovits made personnel decisions based on a candidate's weight and his perception of the candidate's physical attractiveness. (Id. ¶¶ 21-22.) Boutros told Chef Landman that she felt "uncomfortable" with these hiring practices. (Id. ¶ 23.)

Lebovits was allegedly fond of the female members of the Boutros family and hired several of them to work at Park Plaza. He expressed interest in and hired Boutros's aunt as his secretary. (Id. ¶ 24.) But the aunt quit because Lebovits tried to hug her. (Id.) Lebovits told Boutros and her sister, who also worked at Park Plaza, that they were beautiful and that he wanted to extend his gratitude to their mother. (Id. ¶ 25.) On one occasion, Lebovits gestured to Boutros for a hug, but she rebuffed him. (Id. ¶ 17.) Another time Lebovits bumped into Boutros and held her waist. (Id. ¶ 18.) He remained there until she pushed him and asked, "What's

3

wrong with you?" (Id.) Boutros reported Lebovits's behavior to Chef Landman. (Id.)

In July 2015, Lebovits told Chef Landman that he did not want the Park Plaza's chairman of the board in the kitchen during his visit to the facility. (Id. ¶ 26.) Chef Landman relayed the message to Boutros to keep the chairman away from the kitchen area. (Id. ¶¶ 26-27.) As Boutros wheeled the chairman into the dining area for dinner, Lebovits approached from behind and "shoved" Boutros in front of her co-workers. (Id. ¶ 27.) She left the dining area feeling humiliated and in tears. (Id. ¶¶ 28, 68.) That same week, the chairman asked Boutros to meet with him to discuss the incident. (Id. ¶ 30.) After meeting with the chairman, she also met with Lebovits and demanded an apology from him. She also confronted him about work-related issues, including fair wages for her and her wait staff. (Id. ¶¶ 30-32.) The next day, the chairman spoke with Boutros and again asked her to return to work. (Id. ¶ 33.) She expressed concerns about Lebovits but agreed to return. (Id.) During the meeting, the chairman sent Boutros on an errand to the kitchen where she encountered Lebovits staring at her. (Id. ¶ 34.) She feared for her safety, so she called the police and filed a complaint against Lebovits for having shoved her earlier in the week. (Id. ¶¶ 34-35.) Shortly thereafter, Lebovits allegedly suspended her from work without a reason. (Id. ¶ 39.)

Three weeks later, a Park Plaza board member ("Alan") contacted Boutros and informed her that she would be returned to work because some employees allegedly threatened "to quit in protest over what Mr. Lebovits had done to her, and

4

this caused too much disruption." (Id. ¶ 40.) Alan also told Boutros that she would be demoted to the position of staff waitress. (Id.) She returned to work despite the demotion because she needed the work. (Id. ¶ 41.) Upon returning, Boutros alleges that an employee loyal to Lebovits (but not Lebovits himself) began harassing her. (Id. ¶ 42.) Boutros made yet another complaint, this time to Alan, about feeling uncomfortable and afraid. (Id. ¶ 44.) Alan instructed her to leave work while he took care of things. (Id.) On August 7, 2015, Boutros filed a charge of discrimination with the EEOC. (Id. ¶ 45.) A week later, on August 14, 2015, Park Plaza fired Boutros for walking off the job. (Id. ¶ 46.)

Boutros only added a handful of allegations to supplement the original complaint. The new allegations are primarily focused on hiring practices encouraged by Lebovits. (See, e.g., id. ¶¶ 20-23.) For example, Boutros describes her role in recruiting wait staff. She conducted screening interviews with Chef Landman, but Lebovits took responsibility for hiring new employees. (Id. ¶ 20.) Another new allegation recounts how Lebovits once decided against hiring a candidate "because of her weight." (Id. ¶ 21.) On another occasion, Lebovits allegedly instructed Boutros to recruit an attractive candidate to work in his office. (Id. ¶ 22.) All of this, Boutros reports, made her feel "uncomfortable." (Id. ¶¶ 20, 23.) Notably, these new allegations do not address the deficiencies the court identified during the hearing on Lebovits's first motion to dismiss—the absence of allegations demonstrating extreme and outrageous conduct.

5

**Analysis**

A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits. *See Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). When assessing the sufficiency, the court's consideration must be limited to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). To survive a motion to dismiss, a complaint must merely give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," and include allegations that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation omitted). This means that a motion to dismiss must be denied unless the complaint lacks enough facts "to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Boutros asserts that the court may dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." (R. 42, Pl.'s Mem. at 4 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).) But this is an outdated motion to dismiss standard. The Supreme Court rejected that "famous remark" when it clarified that a complaint must actually suggest that the plaintiff has a right to relief. *EEOC v. Concerta Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at

560-63 (declaring that after puzzling the legal profession for 50 years, it was time for the "no set of facts" language to be retired and forgotten)). Accordingly, in reviewing the current motion, the court must ensure that the allegations show Boutros's right to relief above the speculative level. *Twombly*, 550 U.S. at 555.

When ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded allegations of the complaint and considers them in the light most favorable to the plaintiff. *See Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013). A complaint need not elaborate on every fact, if it describes "the principal events giving rise to the suit and attache[s] them to a right of action cognizable under state law." *Zuidema v. Raymond Christopher, Inc.*, 866 F. Supp. 2d 933, 942 (N.D. Ill. 2011) (denying motion to dismiss IIED claim). When an amended complaint asserts the same allegations as an earlier complaint, however, the court must reach the same result on a Rule 12(b)(6) motion. *Michalowski v. Rutherford*, 82 F. Supp. 3d 775, 791 (N.D. Ill. 2015) (dismissing previously dismissed claim that relied on same allegations); *Bergstrom v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 03 CV 3151, 2004 WL 1146626, at *1 (N.D. Ill. May 19, 2004) (noting that the claim was dismissed twice, but with prejudice the second time because the amended complaint set out the same allegations).

To state a claim for IIED under Illinois law, Boutros must allege facts that, if true, would meet the requirements of the three-prong IIED inquiry: (1) Lebovits's conduct was extreme and outrageous; (2) he acted with either the intent to cause or the knowledge of a high probability that the conduct would cause severe emotional

7

distress; and (3) the result was severe emotional distress. *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016); *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003). This "tort does not extend to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (quoting Restatement (Second) of Torts § 46, cmt. d, at 73 (1965)); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016). This tort also "generally involve[s] circumstances beyond what can be considered a typical employment dispute better addressed in a Title VII or equivalent suit." *Piech v. Arthur Andersen & Co.*, 841 F. Supp. 825, 831-32 (N.D. Ill. 1994). Lebovits contends that Boutros's allegations fail to demonstrate that he engaged in "extreme and outrageous" conduct or that he was aware his conduct would cause extreme emotional distress. (R. 37, Lebovits's Mem. at 10, 13.) The court agrees.

**A.    Extreme and Outrageous Conduct**

In opposing the first prong of the IIED test, Lebovits argues that Boutros's allegations "do not even come close to constituting the extreme and outrageous behavior that Illinois courts mandate is necessary to pursue a claim for IIED." (R. 37, Lebovits's Mem. at 11.) Lebovits contends that Boutros's IIED "allegations still fall woefully short" and again argues, as he did in his first motion to dismiss, that the appropriate scope of extreme and outrageous conduct for a valid IIED claim in the employer/employee context should be limited to "coercion to engage in illegal activity . . . a coercive sexual relationship . . . or a pattern of threats of rape or death

8

or offers of money for sex." (Id. (quoting *Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1115 (Ill. App. Ct. 1999)).)

In response, Boutros also repeats several arguments she asserted in response to the first motion to dismiss. She contends that the working relationship between Boutros and Lebovits is significant to the analysis of whether his alleged conduct qualifies as extreme and outrageous. (R. 42, Pl.'s Resp. at 6.) Boutros again argues that she was not just subject to "everyday job stresses" and that Lebovits acted in a manner beyond the "common bounds of decency." (Id. (citing *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765 (Ill. 1976)).) In response to the current motion to dismiss, however, Boutros incorporates a slightly different tack and shifts her focus to argue that she was coerced to participate in illegal activity—specifically, unlawful hiring practices. Boutros argues that she followed Lebovits's instructions to recruit "sexy," "young, pretty girls" and to weed out African Americans, practicing Muslims, and female dishwashers, a practice that Boutros asserts demonstrates how Lebovits abused his power and implemented discriminatory policies in violation of Title VII and the Age Discrimination in Employment Act ("ADEA"). (R. 42, Pl.'s Resp. at 7.)

To meet the outrageous threshold of the first prong of an IIED inquiry, a defendant's conduct must be so extreme as to go "beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *U.S. ex rel. Howard v. Urban Inv. Trust, Inc.*, No. 03 CV 7668, 2010 WL 832294, at *5 (N.D. Ill. March 8, 2010) (citation omitted). Whether conduct reaches that threshold "is judged on an objective standard, based on all the facts and circumstances of the

9

particular case." *Shamin v. Siemens*, 854 F. Supp. 2d 496, 511 (N.D. Ill. 2012) (citations omitted).

The Seventh Circuit has explained that "Illinois courts have found extreme and outrageous behavior to exist in the employer/employee context when the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (citation omitted); *see also Milbrandt v. Brown*, No. 15 CV 7050, 2016 WL 3387160, at *5 (N.D. Ill. June 20, 2016) (citing *Naeem* and the employer/employee context); *Reed v. Colo. Tech. Univ.*, No. 15 CV 3368, 2016 WL 1019830, at *5 (N.D. Ill. March 15, 2016) (same). At the September 2016 motion hearing, the court noted that there was some disagreement in the briefs and the case law regarding whether an IIED claim in the employment context required allegations of coerced illegal conduct. *See, e.g., Shamin*, 854 F. Supp. 2d at 512 (noting that illegal activity is usually required). True, a plaintiff may proceed past the pleadings stage on an IIED claim if a specific sequence of events involving coerced illegal activity is alleged—in addition to resistance or refusal by the employee to participate and retaliation from the employer. *See id.* But, as the court advised the parties, the position taken by the Seventh Circuit in *Naeem* is the applicable standard in this case, meaning coerced illegal activity is not the only means of proceeding with an IIED claim in the employment context. Even pre-dating *Naeem*, courts rejected the notion that coercion to either commit a crime or engage in sexual misconduct was a

10

prerequisite for an IIED claim in the employment context. *Spahn v. Int'l Quality & Productivity Ctr.*, 211 F. Supp. 2d 1072, 1077 (N.D. Ill. 2002).

When evaluating this prong, courts generally "examine the degree of power or authority the defendant holds over the plaintiff." *Cairel*, 821 F.3d at 835-36 (citations omitted). The Illinois Supreme Court has lowered the "outrageousness" hurdle when there is a power disparity between the parties, such as an employer-employee relationship. *See James F. Jackson v. Local 705, Int'l Bhd. of Teamsters*, No. 95 CV 7510, 2002 WL 460841, at *16 (N.D. Ill. March 26, 2002) (citing *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (overruled on other grounds) and *McGrath*, 533 N.E.2d at 810). The more control a defendant has, the more likely the conduct will be considered outrageous. *McGrath*, 533 N.E.2d at 809. However, even in the employment context, "the conduct complained of must be particularly outrageous." *Piech*, 841 F. Supp. at 831 (citation omitted).

A plaintiff may establish "extreme and outrageous" conduct by alleging a "pattern, course and accumulation" of tortious acts. *Kidney Cancer Ass'n v. N. Shore Comm. Bank and Trust Co.*, 869 N.E.2d 186, 193 (Ill. App. Ct. 2007) (noting a series of acts equivalent to assault, battery, and defamation were sufficiently extreme); *Spahn*, 211 F. Supp. 2d at 1077 (same for a series of sexual harassment, battery, and assault). Indeed, "it is often the cumulative nature of the acts that give[s] rise to a cause of action for [IIED]," *Kidney Cancer Ass'n*, 869 N.E.2d at 193, though independently "one instance of such behavior might not be" enough, *Feltmeier*, 798 N.E.2d at 83; *but see Shamin*, 854 F. Supp. 2d at 512 (explaining

11

that courts reject IIED claims when a supervisor merely conducts "a continuous series of discriminatory acts").

Here, Boutros fails to meet the "extreme and outrageous" element of the IIED under both *Naeem* and the coerced illegal activity theory. First, Boutros does not allege that Lebovits carried out a sufficiently "extreme and outrageous" set of acts under *Naeem*. In fact, although the court commented on the original complaint's deficiencies, the amended complaint includes no additional allegations regarding extreme and outrageous behavior. (Compare R. 1 with R. 33.) The tortious act of battery is described as a single "shove." (R. 33, Am. Compl. ¶¶ 27, 68.) To be sure, even a single shove is unacceptable behavior, but one tortious incident is not extreme and outrageous under the circumstances of this case. *Feltmeier*, 798 N.E.2d at 83; *see also Miller v. Equitable Life*, 537 N.E.2d 887, 888 (Ill. App. Ct. 1989). As a whole, the amended complaint's allegations describe a series of discriminatory hiring practices, which did not impact Boutros's employment, and incidents of retaliatory employment actions. *See Shamin*, 854 F. Supp. 2d at 512 (explaining that a continuous series of discriminatory events is insufficient to proceed on an IIED claim). At the motion hearing, the court highlighted the lack of information about the events generally described in the original complaint and asked whether there were more incidents of physical violence or other tortious conduct. Although certainly improper, the newly alleged conduct taken together with the information previously alleged does not rise to the level of extreme and outrageous. *See Blatnicky v. Vill. of Shorewood*, No. 94 CV 3213, 1996 WL 180070,

at *3 (N.D. Ill. April 15, 1996) (dismissing IIED claim again when amended complaint included three new paragraphs of allegations that were admittedly "inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair" but not extreme and outrageous).

Second, Boutros does not properly allege the narrow sequence of events related to coerced illegal activity under the *Shamin* line of cases. As a rule, courts have found an employer's actions "extreme and outrageous" when an employee experiences retaliation from her employer soon after refusing (or resisting) the employer's instructions to violate a law. *Shamin*, 854 F. Supp. 2d at 512 (citation omitted); *see also Johnson v. Fed. Reserve Bank of Chi.*, 557 N.E.2d 328, 330-31 (Ill. App. Ct. 1990) (finding conduct extreme and outrageous when a supervisor retaliated against an employee for resisting instructions to violate federal banking regulations). The retaliation must occur immediately after the employee resists or refuses to participate in the employer's illegal scheme. *Johnson*, 557 N.E.2d at 331. Lacking a seasonable link between the resistance and subsequent retaliation, an employee's IIED claim should be dismissed. *Blatnicky*, 1996 WL 180070, at *3 (granting motion to dismiss IIED claim when plaintiff failed to allege a close temporal link between the plaintiff's resistance and the alleged retaliation).

Here, while Boutros alleges that she felt "uncomfortable" with the hiring practice, she does not allege that she opposed the practice and as a result fell victim to retaliatory conduct. In her response to the motion to dismiss, Boutros attempts to proceed under the *Shamin* coerced illegal activity theory by alleging that she was

13

coerced to participate in illegal hiring practices at Park Plaza. As alleged, Boutros was responsible for recruiting waitresses and was instructed by Lebovits to only advance the "sexy," "young, pretty girls" through the interview process, a practice she asserts made her feel "uncomfortable" and violated Title VII and the ADEA. (R. 33, Am. Compl. ¶¶ 19-20; R. 42, Pl.'s Resp. Mem. at 7.) Lebovits maintained responsibility for final hiring decisions. (R. 33, Am. Compl. ¶ 20.) She also felt uncomfortable when a job applicant brought a pretty friend and Lebovits asked Boutros to recruit the pretty friend to work at Park Plaza. (Id. ¶ 22.) But these uncomfortable feelings do not establish the friction that Boutros would need to allege between herself and Lebovits to state a viable IIED claim. There is no allegation that Lebovits attempted to coerce Boutros's cooperation in the face of her resistance or her refusal to follow his directions and no allegations that Lebovits retaliated against Boutros for having done so. *Compare Henderson v. Hilton Hotels Corp.*, No. 92 CV 7584, 1994 WL 684947, at *10 (N.D. Ill. Dec. 6, 1994) (dismissing IIED claim because plaintiff "ha[d] not alleged that Hilton pressured her to commit any illegal act") *with Milton*, 427 N.E.2d at 833 (finding that a jury could find an employer's conduct was "outrageous, extreme, and atrocious" when it was alleged that an employer retaliated for an employee's refusal to falsify reports used to bill customers) *and Johnson*, 557 N.E.2d at 331 (explaining the retaliatory conduct was abusive and, though technically legal, served no legitimate purpose because it was designed to punish a whistle-blower). Further weakening Boutros's argument, there is no allegation that Lebovits even knew that she felt "uncomfortable."

Even if reasonable inferences are drawn in favor of Boutros, the allegations do not raise a plausible claim that she was forced to participate in illegal conduct and was subsequently retaliated against immediately after she resisted. While Boutros alleges feeling uncomfortable with the interview screening process, there is no allegation that anybody pressured Boutros to do anything in the face of her theoretical resistance. Also, there is no meaningful difference between the allegations in the original complaint and the amended complaint. Accordingly, the IIED claim fails on the first prong of the IIED inquiry.

**B.    Likelihood to Cause Severe Emotional Distress**

Lebovits separately argues that Boutros's IIED claim is insufficient because she fails to allege that he intended to cause or knew that there was a high probability that his conduct would cause severe emotional distress. (R. 36, Lebovits's Mem. at 13.) Specifically, Lebovits contends "[t]here are no facts alleged which support Plaintiff's conclusion regarding any particularized vulnerability of Plaintiff, Lebovits's knowledge of such a vulnerability or that his conduct would have caused some form of extreme emotional distress to Plaintiff." (Id.) In support, Lebovits argues that the IIED allegations would be insufficient even if he had "reasonably foresee[n] his actions would cause emotional distress." (Id. at 14 (citing *Lewis v. Cotton*, 932 F. Supp. 1116, 1119 (N.D. Ill. 1996)).) Boutros counters that "the conduct Plaintiff has alleged against Defendant Lebovits is what exposes his intent," (R. 42, Pl.'s Resp. at 12), but for this somewhat circular logic to apply, the

15

court would have to first conclude that the alleged conduct meets the extreme and outrageous standard.

Alleged conduct meets the threshold with respect to intent to cause harm when a "defendant's actions, by their very nature, were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress and that, because of this susceptibility, the defendant's actions were likely to cause it to occur." *Honaker v. Smith*, 256 F.3d 477, 494 (7th Cir. 2001) (finding that "[h]aving the mayor of one's town suggest that you leave or be burned out, followed by a fire that all but completely destroys your house, is likely to cause significant trauma"). In the employment context, however, Illinois courts generally require more because "personality conflicts, job performance evaluations, or job transfers are unavoidable and often result in stress. [And] if such stress formed the basis for the tort of [IIED], virtually every employee would have a cause of action." *Lewis*, 932 F. Supp. at 1119 (citation omitted). A plaintiff may meet the threshold by informing the defendant that a course of harassment will cause a severe, negative impact. *McGrath*, 533 N.E.2d at 809; *Graham*, 742 N.E.2d at 869; *Linton v. Hertz*, No. 13 CV 1233, 2015 WL 109888, at *3 (S.D. Ill. Jan. 7, 2015).

In this case, Boutros does not allege that Lebovits continued with a course of conduct after she informed him of any serious impact of his actions. Boutros alleges that she made it known that she was upset about the shoving incident and demanded an apology during a face-to-face meeting with Lebovits. (R. 33, Am. Compl. ¶ 33.) This confrontation stems from a one-time event, not a continuous

16

series of abuse and/or retaliation for refusal to submit to authority. *Cf. McGrath*, 533 N.E.2d at 809; *Linton*, 2015 WL 109888, at *3. Boutros relies on *Honaker* to support this prong of the test, but the threat in *Honaker*—that a mayor would order a man's home burned to the ground if he didn't leave town—was not similar enough to the shove alleged here. *Honaker*, 256 F.3d at 494. Accordingly, Boutros's allegations are also insufficient to meet the second prong.

## Conclusion

For the foregoing reasons, Lebovits's motion to dismiss Count VII of the amended complaint is granted.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**